ARLAN L. ROBINSON AND SANDRA ROBINSON GUNTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robinson v. Commissioner
Docket No. 20588-82
United States Tax Court
T.C. Memo 1990-235; 1990 Tax Ct. Memo LEXIS 242; 59 T.C.M. (CCH) 561; T.C.M. (RIA) 90235; May 14, 1990, Filed *242 Decision will be entered under Rule 155. Paul M. Newton and Fredrick T. Hoff, Jr., for the petitioners. Robert W. West and John B. Harper, for the respondent. SCOTT, Judge. SCOTT *795 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' income tax and additions to tax for Arlan L. Robinson under section 6653(b) [1] for the years and in the amounts as follows: Additions to Tax
Year
Deficiency
Section 6653(b)
1971
$ 30,198.05
$ 15,099.03
1972
32,137.19
16,068.60
1973
52,045.14
26,022.57
1974
76,456.69
38,228.35
1975
91,725.25
45,862.63
1976
47,856.35
23,928.18
1977
42,012.87
21,006.44
1978
61,215.85
30,607.92
1979
30,208.43
15,104.22
*244 The issues for decision are: 1) whether there was an understatement of income by petitioners in any or all of the calendar years 1971 through 1979 resulting in a deficiency in petitioners' income tax for that year; 2) if there was a deficiency in petitioners' income tax in any of the years 1971 through 1979, whether any part of such deficiency was due to fraud on the part of petitioner, Arlan L. Robinson, with intent to evade tax so as to make him liable for the addition to tax for fraud under section 6653(b); *796 3) whether the statute of limitations bars the assessment of any deficiency in income tax for any of the calendar years 1971 through 1978; 4) if there is a deficiency in income tax for any of the calendar years 1971 through 1979, whether petitioner Sandra Robinson Gunter, who signed joint returns for each of the years with her then husband, Arlan L. Robinson, is entitled to be relieved of liability for such deficiency (including interest, penalties, and other amounts) under the provisions of section 6103(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, who were husband and wife during the years here in issue, each resided *245 in Biloxi, Mississippi, at the time of the filing of their petition in this case. Petitioners were divorced in 1980. Petitioners filed joint Federal income tax returns for each of the calendar years 1971 through 1979 with the Director, Internal Revenue Service Center, Chamblee, Georgia, on or before April 15 of the year following the year for which the return was filed. For some years prior to 1971 and during 1971 and part of 1972 Arlan L. Robinson (petitioner) owned and operated Robinson Mercury, Inc., a Mississippi corporation, the principal business of which was the retail sale of automobiles in Gulfport, Mississippi. The automobile dealership was sold in 1972. In 1967 petitioner was elected for a 4-year term as a supervisor of Harrison County, Mississippi, and was reelected in 1971 and 1975 for successive 4-year terms. Petitioner served as a supervisor of Harrison County from January 1968 until January 1980. Petitioner did not seek reelection in 1979. There were five elected supervisors of Harrison County. The county was divided into five divisions called beats. Each beat elected a supervisor. The supervisor of each beat administered county operations within that beat *246 and the supervisors jointly administered operations as the legislative body of the county. Petitioner represented Beat 5 of Harrison County. The supervisor of each beat was authorized to hire the employees for his beat. These employees were hired either by the Beat supervisor or the superintendent for the beat who was hired by the supervisor. Prior to the middle of 1974 the supervisor of each beat had the authority to engage contractors to do work in the beat and to purchase the materials needed by the beat for that work. Starting in about the middle of 1974 the county put in a system that required suppliers of materials and persons doing work for the county to submit bids to the county usually on a 6-month basis. The lowest and best bid would generally be accepted by a vote of the five supervisors requiring a vote of three to accept a bid. The supervisor of each beat was still authorized to order the supplies for that beat from the lowest bidder and at times the supervisors, when a bid of one individual was about to expire, would order a stockpile of material from that individual which would be sufficient for the use of his beat for several months or perhaps the entire six months *247 until another invitation to bid was issued. At times a supervisor of a particular beat would put something up for bid and describe it in such a detailed way that only one person, or a very limited number of persons, could bid on it. Also, county supervisors, at times, would order one item and instead of receiving the item ordered, would accept another item from a different individual. The county supervisors retained authority to order, without bids, materials below a certain cost. Petitioner received a salary as supervisor of Beat 5 during each of the years 1971 through 1979 in the amounts shown: 1971
$  8,799.96
1972
9,353.95
1973
12,399.96
1974
13,458.22
1975
15,000.00
1976
15,000.00
1977
15,500.00
1978
17,400.00
1979
17,400.00
Petitioner also received a salary from Robinson Mercury, Inc., in 1971 of $ 8,482.20 and 1972 of $ 4,000. *797 During the taxable years 1971 through 1979 petitioner derived taxable income from various sources. The following sources of income were reported on petitioner's income tax returns for these years: 1) salary and dividends from Robinson Mercury, Inc.; 2) salary from his position as supervisor of Beat 5 of Harrison *248 County, Mississippi; 3) dividend income from corporate stocks he owned; 4) interest income from savings accounts and other interest-bearing securities he owned; 5) commission income; 6) gains from the sales of corporate stocks, land, and other assets; 7) rental income from the lease of real estate; 8) income from the sale of timber; and 9) income from the operation of a farm, including the sale of cattle. When respondent investigated petitioners' income tax returns for the years 1971 through 1979, he determined that the records to the extent they were available to the revenue agent were not sufficient to determine petitioners' taxable income for those years and computed petitioners' income using the net worth plus cash expenditures method of reconstructing income. The following schedule shows various assets and liabilities of petitioners, petitioners' living expenses, and certain adjustments to petitioners' income for the years indicated: 1/1/71
12/31/71
12/31/72
12/31/73
Cash in banks:
First Miss. Nat. Bank
2,890
12,313 2,313 912 Gulf National Bank
0
0 5,199 57,709 First Nat. Bk. of Wiggins
0
0 0 0 Coast Federal S & L
0
0 101,301 17,008 Stocks:
Robinson Auto
54,872
54,872 0 0 Merchants Bank
2,700
0 0 0 Great Southern Bus. Corp.
5,000
5,000 5,000 5,000 Coast Cattle Co.
0
0 0 1,000 Autos-Personal
0
0 0 0 Real Estate:
1956-Acreage
11,000
11,000 11,000 0 1969-Acreage
6,067
6,067 6,067 0 1958-Biloxi residence
25,000
25,000 25,000 25,000 1969-40 acres
-Salida Breland
5,000
5,000 5,000 5,000 1971-50 acres-Dedeaux Rd.
0
90,000 90,000 90,000 1971-40 acres-Lee
0
5,000 3,000 3,000 1972-73-Stone Co. residence, etc.
0
10,000 20,797 20,797 1973-40 acres-LeBlanc
0
0 0 7,000 1973-160 acres-Crawford
0
0 0 20,661 1974 Batson Property
0
0 0 0 1975-40 acres
0
0 0 0 1977-Barn-2,000 sq. ft.
0
0 0 0 1977-Sheds-2,000 sq. ft.
0
0 0 0 1977-Barn & Sheds
0
0 0 0 Life Insurance Value
0
0 0 0 Farm Assets:
1972-79-Per Schedule F
0
0 7,272 29,155 1973-Tractor
0
0 0 0 1973-74-Fence
0
0 0 3,150 Loan Receivable
0
0 0 9,445 Note Receivable-Jess Parker
0
0 0 0 Liabilities:
Notes Payable
0
80,000 72,000 81,000 Accounts Payable
0
0 0 0 Life Insurance Loan Payable
0
0 0 0 S.B.A. Loan Payable
0
0 0 0 Bank Loans Payable
0
0 0 0 Adjustments: *
Personal Living Expense
13,123 12,173 14,501 Income Tax Paid
3,958 4,872 15,116 Fair Rental Value-Auto
0 0 2,100 Non-taxable Portion of Capital Gains
0 (39,488)
(19,996)
Life Insurance Premiums Paid
877 877 877 Deductions: *
Standard Deduction
(1,500)
0 0 Medical
0 0 (109)
Taxes
0 (2,163)
(4,561)
Contributions
0 (10)
(6)
Interest
0 (4,000)
(3,600)
Miscellaneous
0 0 (225)
Personal Exemptions *
(3,375)
(3,750)
(3,750)
Taxable Income, per Return
23,804 53,249 22,734 *249 12/31/74
12/31/75
12/31/76
12/31/77
Cash in banks:
First Miss. Nat. Bank
962 512 2,279 846 Gulf National Bank
5,902 4,174 1,448 13,314 First Nat. Bk. of Wiggins
0 0 0 0 Coast Federal S & L
16,090 1,418 47,457 1,026 Stocks:
Robinson Auto
0 0 0 0 Merchants Bank
0 0 0 0 Great Southern Bus. Corp.
5,000 5,000 0 0 Coast Cattle Co.
0 0 0 0 Autos-Personal
0 0 0 0 Real Estate:
1956-Acreage
0 0 0 0 1969-Acreage
0 0 0 0 1958-Biloxi residence
25,000 25,000 25,000 25,000 1969-40 acres
-Salida Breland
5,000 5,000 5,000 5,000 1971-50 acres-Dedeaux Rd.
90,000 90,000 90,000 90,000 1971-40 acres-Lee
3,000 3,000 3,000 3,000 1972-73-Stone Co. residence, etc.
20,797 20,797 20,797 20,797 1973-40 acres-LeBlanc
7,000 7,000 7,000 7,000 1973-160 acres-Crawford
20,661 20,661 20,661 20,661 1974 Batson Property
170,503 170,503 170,503 170,503 1975-40 acres
0 0 0 0 1977-Barn-2,000 sq. ft.
0 0 0 0 1977-Sheds-2,000 sq. ft.
0 0 0 0 1977-Barn & Sheds
0 0 0 6,000 Life Insurance Value
0 0 0 0 Farm Assets:
1972-79-Per Schedule F
33,592 33,592 23,320 23,320 1973-Tractor
0 0 0 0 1973-74-Fence
6,300 6,300 6,300 6,300 Loan Receivable
0 0 0 0 Note Receivable-Jess Parker
0 0 0 0 Liabilities:
Notes Payable
186,000 145,500 105,000 64,500 Accounts Payable
0 0 1,079 1,833 Life Insurance Loan Payable
0 0 0 0 S.B.A. Loan Payable
0 0 0 0 Bank Loans Payable
0 0 65,000 65,000 Adjustments: *
Personal Living Expense
11,049 16,522 20,544 18,575 Income Tax Paid
1,431 4,517 (1,736)
4,648 Fair Rental Value-Auto
2,300 2,500 2,700 2,900 Non-taxable Portion of Capital Gains
(1,799)
(650)
0 (101)
Life Insurance Premiums Paid
877 877 877 877 Deductions: *
Standard Deduction
0 0 0 0 Medical
(109)
(109)
(150)
(150)
Taxes
(2,600)
(1,149)
(1,263)
(2,140)
Contributions
(33)
0 (10)
0 Interest
(3,200)
(8,231)
(10,577)
(9,890)
Miscellaneous
(385)
(275)
(125)
(1,082)
Personal Exemptions *
(3,750)
(3,750)
(3,750)
(3,750)
Taxable Income, per Return
1,069 8,676 18,256 18,769 *250 12/31/78
12/31/79
Cash in banks:
First Miss. Nat. Bank
1,310 972 Gulf National Bank
0 0 First Nat. Bk. of Wiggins
166 16,735 Coast Federal S & L
3,061 3,053 Stocks:
Robinson Auto
0 0 Merchants Bank
0 0 Great Southern Bus. Corp.
0 0 Coast Cattle Co.
0 0 Autos-Personal
11,865 19,115 Real Estate:
1956-Acreage
0 0 1969-Acreage
0 0 1958-Biloxi residence
25,000 25,000 1969-40 acres
-Salida Breland
5,000 5,000 1971-50 acres-Dedeaux Rd.
90,000 90,000 1971-40 acres-Lee
3,000 3,000 1972-73-Stone Co. residence, etc.
20,797 20,797 1973-40 acres-LeBlanc
7,000 7,000 1973-160 acres-Crawford
20,661 20,661 1974 Batson Property
152,890 152,890 1975-40 acres
0 0 1977-Barn-2,000 sq. ft.
0 0 1977-Sheds-2,000 sq. ft.
0 0 1977-Barn & Sheds
6,000 6,000 Life Insurance Value
0 0 Farm Assets:
1972-79-Per Schedule F
21,707 26,417 1973-Tractor
0 0 1973-74-Fence
6,300 6,300 Loan Receivable
0 0 Note Receivable-Jess Parker
40,000 0 Liabilities:
Notes Payable
24,000 16,000 Accounts Payable
1,766 868 Life Insurance Loan Payable
10,325 10,325 S.B.A. Loan Payable
37,000 34,797 Bank Loans Payable
18,500 0 Adjustments: *
Personal Living Expense
21,297 14,083 Income Tax Paid
3,398 6,775 Fair Rental Value-Auto
0 0 Non-taxable Portion of Capital Gains
(6,181)
(18,011)
Life Insurance Premiums Paid
877 220 Deductions: *
Standard Deduction
0 0 Medical
(150)
(150)
Taxes
(1,764)
(3,263)
Contributions
0 0 Interest
(12,171)
0 Miscellaneous
(2,259)
0 Personal Exemptions *
(3,750)
(5,000)
Taxable Income, per Return
33,211 55,419 *251 *800 The land shown on the schedule as acquired by petitioner during the years here in issue was purchased by him. In addition to the land he owned, petitioner leased approximately 1,200 acres of adjoining land. Except for 40 acres of the land purchased by petitioner on January 10, 1969, referred to by the parties as the Saleta Breland land, most of the land petitioner owned and that he rented was used for raising cattle. At the time petitioner purchased the Saleta Breland land, which is located in Stone County, Mississippi, which county is immediately north of Harrison County, Mississippi, it was unimproved. Petitioner improved the property with a lake and dam and with a house built in 1971 and 1972. The improvements to this land also included stables for horses, a wooden bridge across the lake, and a barn. The land purchased by petitioner from Ferris S. Batson for $ 180,543 *252 in 1974 (sometimes referred to by the parties as the Ferris Batson land and sometimes as the Big Level land) is also in Stone County and between two and four miles north of land previously purchased by petitioner referred to as the Red Creek Land. The Ferris Batson land and the Red Creek land are separated by Red Creek and, there is no direct access across the creek between the Red Creek land and the Ferris Batson land. Petitioner used a portion of the Ferris Batson land for raising cattle and leased a portion of it to others for various agricultural purposes. In 1974 petitioner sold approximately 22.89 acres of the Ferris Batson land and in 1978 he sold 40 acres of that land. Otherwise, petitioner owned all the land purchased from 1969 through 1974 throughout the years here in issue. Sometime in 1979 the Federal Bureau of Investigation commenced an investigation of petitioners's activities as supervisor of Beat 5 of Harrison County, Mississippi, and as a result of this investigation, a 5-count indictment was returned against petitioner on January 7, 1981. Count one of the indictment alleged a violation by petitioner of 18 U.S.C. 1951 (1976) (Hobbs Act), *253 charging him in 1978 with knowingly and willfully obtaining a water well drilled at his residence in Stone County, Mississipp, from Braden Pump and Well Service Inc., induced by the wrongful use of fear of economic loss and under color of official right, which property he was not entitled to obtain. Count two charged petitioner with violation of 18 U.S.C. 1951 (1976) (Hobbs Act), by the extortion of cash from Larry Breland Trucking Company during the period November 1977 through January 1979. Count three charged petitioner with obtaining cash from Mid-South Gulf Products Company, Inc., from March 1976 through September 1978, through wrongful use of fear of economic loss and under color of official right. Count four charged petitioner with violation of section 42 U.S.C. 6721 et seq., for diverting and converting a portion of the funds to pay the salary of Robert Marion Daniels (Bobby Daniels) to his personal use by having Daniels perform private work on his property while being paid by funds of Harrison County, Mississippi, a part of which were provided through Federal funds during the period February 1977 through August 1978. Count *254 five charged petitioner with violation of section 42 U.S.C. 6721 et seq., by diversion and conversion of a portion of the funds of Harrison County used to pay the salary of Lennis Hudson by having Lennis Hudson do private work on his property during the period August 1977 through August 1978 while being paid as an employee of Harrison County with funds partially furnished by the Federal government. A jury trial was held in the United States District Court for the Southern District of Mississippi. Petitioner was convicted on counts one, four, and five, and acquitted on counts two and three. Petitioner appealed his conviction to the Court of appeals for the Fifth Circuit where his conviction was affirmed. Petitioners had owned a house in Biloxi, Mississippi, which was their home since sometime in 1958. This home was occupied by petitioners as their home from the time of its purchase throughout the years involved in this case. Beginning in 1971 and continuing through 1972, petitioners built a house on the Saleta Breland land in Stone County. This house contained three bedrooms, two baths, a large room which contained the kitchen, dining space, and a den *255 or living room. The house also had an open downstairs recreation room. After completion of the house, petitioners furnished it. Petitioners had the house carpeted and they bought two bedroom suites, one single bed, a couch and a loveseat, new appliances consisting of a stove, refrigerator, trash compactor, dishwasher, washing machine and dryer, and a pool table for the recreation room and some bar stools. The house also contained a dinette set and a lazy boy recliner and a deep freeze. Petitioners moved one bedroom suite from their residence in Biloxi to the Stone County house and in 1972 purchased a new bedroom suite for the Biloxi house to replace the one moved to the Stone County house. At times during the period 1971 through 1979 petitioner owned a diamond ring, a wedding band, three watches, and a gold chain in the center of which was a gold coin. Mrs. Robinson owned a watch, a diamond ring, and a wedding band during this period of time. At the beginning and end of 1971 petitioners had furniture, fixtures, and jewelry which had cost them $ 5,000. During each of the years 1972 and 1973 petitioners spent an additional $ 5,000 for such items. In each of the years 1974 *256 and 1975 petitioners spent an additional $ 10,000 for such items, and in each of the years 1976, 1977, *801 1978, and 1979 an additional $ 1,000, $ 1,500, $ 1,000, and $ 1,500, respectively. Some time after petitioner purchased the Saleta Breland land in Stone County on January 10, 1969, clearing was done to permit the building of a dam and a lake on the land. The dam built by petitioner on the Breland land was approximately 344 feet long and 16 feet wide across the top. It was constructed by Gulf Paving, Inc. of Biloxi, Mississippi. The lake covered approximately 17 to 18 acres and was spring-fed. It was equipped with a gravity-operated discharge to insure that the lake water remained fresh. The dam contained 12,350 cubic yards of dirt and the clay core for the dam contained 1,572 cubic yards, for a total of 13,922 cubic yards for the dam and core combined. In order to be effective, an earthen dam must have a clay core in the center of the dam. The clay core prevents the dam from leaking by making the dam impervious to water seepage. A dam without a clay core will seep water and not be effective. The equipment used by Gulf Paving, Inc. in building the dam included a bulldozer, *257 a scraper, and a sheep's foot roller. The cost of construction of the dam including materials was approximately $ 18,000. It took Gulf Paving, Inc. approximately 2 to 3 months to build the dam working on it on a less than full time basis. The dam could have been constructed in approximately 3 to 4 weeks if Gulf Paving, Inc. had worked 7 days a week, 12 hours a day. Gulf Paving, Inc. always had at least two people working on the dam whenever any work was done and sometimes more than two people. At least two people were needed at all times for safety reasons because of the danger involved if only one person was working. Gulf Paving, Inc. did not do any of the clearing of the land for the lake, but only built the dam. The primary business of Gulf Paving, Inc. was road and highway construction, subdivision construction, and asphalt paving. Gulf Paving, Inc. did a substantial amount of work for Beat 5 of Harrison County throughout petitioner's three terms as supervisor of Beat 5. Gulf Paving, Inc. was not in the business of building dams and would not have built a dam on the property of a person who had no relationship with the officers of the company. Gulf Paving, Inc. built the *258 dam on petitioner's property because of petitioner's friendship with officers of the corporation, his position, and in the expectation of doing future business with Harrison County.
After his purchase of 368 acres of land in Stone County on January 9, 1974, petitioner owned over 700 acres of land in Stone County or its surrounding counties. Very little of the land petitioner purchased was cleared and in condition to use for pasture for cattle raising or for farming at the time he acquired it. The leased land also was mostly uncleared. By December 31, 1979, substantially all of the lands petitioner owned were cleared and planted in pasture and substantially all of the leased lands were in timber. Donald and Rose Breland were the owners and operators of Breland Trucking and Construction Company prior to and during 1973 and 1974. The company was located in Picayune, Mississippi prior to 1973. It was engaged in the business of road construction, road and site preparation, hauling dirt, gravel and other materials, and laying asphalt. Breland Trucking and Construction Company owned and used in its business heavy equipment, such as trucks, bulldozers, front-end loaders, backhoes, *259 asphalt spreaders, draglines, motor graters, welding machines, and tractors. In January 1973 Breland Trucking and Construction Company moved its operation and asphalt plant to Harrison County, Mississippi. It operated in Harrison County, Mississippi from January 1973 until approximately September 1, 1974, when the company filed for bankruptcyh and went out of business. In 1973 and 1974 Breland Trucking and Construction Company did business for Harrison County. It was customary in Harrison County for businesses awarded contracts to do favors for or make payoffs or kickbacks to the beat supervisors and sometimes the beat superintendent. During the period from early 1974 until Breland Trucking and Construction Company went into bankruptcy in 1974, Rose Breland on behalf of Breland Trucking and Construction Company made certain cash payments to petitioner and from mid-1973 furnished labor and materials to petitioner in the form of work performed by employees of Breland Trucking and Construction Company with materials furnished by that company on petitioner's farm in Stone County, Mississippi. Breland Trucking and Construction Company received no compensation from petitioner for the *260 work its employees did on petitioner's farm in 1973 and 1974 and no payment from petitioner for the materials used in that work. In the opinion of Rose Breland, as an officer of Breland Trucking andtion of the house, petitioners furnished it. Petitionersis are reductions which decrease net worth.
upon the Wisconsin Tax Appeals Commission within 30 days of service of this decision if there has been no petition for rehearing, or within 30 days of service of the order finally disposing of the petition for rehearing, or within 30 days after the final disposition by operation of law of any petition for rehearing. The 30 days period commences the day after personal service or mailing of the decision to order, or the day after the final disposition by operation of law of any petition for rehearing. (DecTrucking and Construction Company, the cash payments to petitioner and the work done on petitioners' land were necessary in order for the company to continue to perform work for Beat 5 of Harrison County. The following types of work were done by employees of Breland Trucking and Construction Company on *261 petitioner's Stone County farm: (a) Farm roads were built from petitioner's residence to other properties he owned; (b) land was cleared of trees and other foliage, leveled and prepared to be converted to pasture; (c) asphalt was placed on the main entrance road to and the driveway of petitioner's house and around the base of the house and on the *802 spillway of the dam; (d) cattle ponds were built or improved on the farm; (e) fences were put up around the farm; (f) fertilizer was hauled for use on the pastures; (g) gravel, clay gravel, sand, fill dirt, and other materials needed for construction of the roads and improvement of the land were furnished; and (h) farm work such as feeding and branding cattle and hauling hay was done. All equipment needed to perform the work performed by employees of *803 Breland Trucking and Construction Company including draglines, motor graders, bulldozers, trucks, tractors, asphalt spreaders, front-end loaders, and welding machines were supplied from the equipment owned by Breland Trucking and Construction Company for the work it did on petitioner's farm. Breland Trucking and Construction Company paid its employees for the hours they worked on petitioner's *262 farm and paid the operating expenses of its machinery which was used on petitioner's farm. The only payment Breland Trucking and Construction Company received with respect to work done on petitioner's farm during 1973 and 1974 was $ 12,000 received from Harrison County which was placed on a Harrison County invoice, but actually represented payment for work done on the farm. Petitioner made the arrangements for Breland Trucking and Construction Company to receive the $ 12,000 payment from Harrison County by use of a fictitious delivery ticket in favor of Breland Trucking and Construction Company. Breland Trucking and Construction Company employees worked on petitioner's farm on an on-and-off basis, but not on a consistent basis, from the summer of 1973 until toward the end of August 1974. On January 8, 1974, Rose Breland made a $ 5,000 cash payment to petitioner which amount came from the $ 12,000 check of Harrison County given to her purportedly for Harrison County work, but actually for work done on petitioner's farm. Thereafter, Rose Breland made other cash payments to petitioner. At the end of August 1974, Breland Trucking and Construction Company ceased operations when it *263 filed a liquidating bankruptcy proceeding. In April 1976, Donald and Rose Breland began doing business in their individual capacity under the name of Breland Trucking Company. The new individual business did approximately the same type of work that had been done by Breland Trucking and Construction Company, except that this business did not sell or lay asphalt. After Don and Rose Breland started in business as the Breland Trucking Company, they again began doing work for Beat 5 of Harrison County. At this time they had to put in bids for the work they wanted and they obtained hauling work by having a low bid to haul sand, gravel, shale, and other items. Petitioner or the superintendent for Beat 5 would come by and tell Rose Breland what the prior low bid had been and would suggest that the bid of Breland Trucking Company be substantially lower with the understanding that extra tickets for hauling that was not done would be written to make up for the low price. In return for arranging for Breland Trucking Company to get business on low bids and for the work it was given in Beat 5, starting in 1977, Rose Breland again periodically made cash payments or kickbacks in amounts ranging *264 from $ 1,500 to $ 6,000 to petitioner. Also starting in 1977, employees of Breland Trucking Company began to do work on petitioner's farm. Work was done by employees of Breland Trucking Company on petitioner's farm from 1977 to sometime in 1979. The nature of this work was somewhat different from most of the work done by employees of Breland Trucking and Construction Company in 1973 and 1974. During 1977 through 1979 employees of Breland Trucking Company hauled fertilizer for petitioner's farm and worked in connection with cutting hay and baling hay and, in addition, the employees of Breland Trucking Company dug a pond on petitioner's farm in the area referred to as Big Level. In addition to cutting and baling hay employees of Breland Trucking Company picked up hay behind tractors and stacked it in petitioner's barn. Rose Breland owned a small International cub tractor which she used for yard work around her house. Petitioner had expressed an interest in the tractor and said he wanted it. Petitioner mentioned that fact to her several times. Rose Breland had bought this tractor sometime around 1973 and she kept it at her house. Tractors like the cub tractor she had were hard *265 to find. At the insistence of petitioner, Rose Breland in 1978 took the cub tractor up to his Stone County farm and let him have it. The reason she took the tractor up to petitioner's farm was at his insistence and because she felt it was necessary to do this to keep doing business with Beat 5 of Harrison County. Rose Breland was not paid either for the work her employees did on petitioner's farm during 1977 through 1979 or for the tractor, except by being given work for Beat 5 of Harrison County. During 1973 and 1974 when Breland Trucking and Construction Company was doing work for petitioner on his farms, the company at times left various pieces of its own equipment on his farms. This equipment included draglines, motor graders, bulldozers, trucks, tractors, asphalt spreaders, front-end loaders, and welding machines. In September 1974 when Breland Trucking and Construction Company filed for bankruptcy and ceased doing business, some of the company's equipment was on petitioner's farm. Some of the equipment was returned to Breland Trucking and Construction Company but a motor grader of Breland Trucking and Construction Company was kept by petitioner, even though he was requested *266 to return it. Also a tractor was kept and a welding machine and a bucket for a dragline. The equipment that stayed on petitioner's farm was reported as a part of the bankruptcy estate in the bankruptcy proceedings, but neither Rose Breland nor the trustee in bankruptcy ever obtained the motor grader, the tractor, the welding machine, or the bucket which petitioner kept on his farm at the time of the bankruptcy. Neither Breland Trucking and Construction Company nor the bankruptcy estate was ever paid for these items. The labor done on petitioner's farms by equipment and employees of Breland Trucking and Construction Company and the materials furnished by that company without compensation from petitioner in 1973 and 1974 would have cost petitioner approximately $ 62,500 in each of the years 1973 and 1974 had petitioner paid for the work. Of the work done by employees and equipment of Breland Trucking and Construction Company for petitioner in 1973 and 1974, approximately 80 percent was for capital improvements that increased the value of petitioner's property. Petitioner's net worth increased by $ 50,000 in 1973 and $ 50,000 (cumulatively $ 100,000) in 1974 by what would have *267 been the cost to petitioner for the labor, equipment rental, and materials furnished by Breland Trucking and Construction Company for capital improvements to petitioner's farms. The only work done by employees of Breland Trucking Company during the period 1977 through 1979 which resulted in capital improvements to petitioner's farm was the digging of the pond on the Big Level tract. The motor grader belonging to Breland Trucking and Construction Company which petitioner kept in 1974 had a value of approximately $ 12,500, the tractor a value of approximately $ 600, and the welding machine a value of approximately $ 1000. The value of the cub tractor which petitioner obtained from Rose Breland personally in late 1977 had a value of approximately $ 1000. During the time petitioner was supervisor of Beat 5 of Harrison County the number of employees working for the county ranged from a low of 20 to a high of 40 employees. Either petitioner or Joe Shelton, the superintendent of Beat 5, hired those employees. Petitioner, starting sometime in 1976, instructed Joe Shelton to send certain county employees to do work on petitioner's farm. These employees were full time employees of Harrison *268 County and were being paid by Harrison County. These employees were at petitioner's instruction sent to work on his farm during the regular working hours of employees for Harrison County. Some of the employees sent to work on petitioner's farm would spend as little as one day at a time working there and others would spend over a year or a year and one-half working there. When the employees working on petitioner's farm needed any type of equipment, Joe Shelton usually sent county equipment up to be used and sent at least two employees with the equipment. Rex Bosarge was one of the county employees who was sent to petitioner's farm by Joe Shelton. Rex Bosarge began work on petitioner's farm in July 1977 and continued until the FBI began investigating petitioner's activities in February 1979. Rex Bosarge spent at least one-half of his working time during the period July 1977 to February 1979 doing work on petitioner's farm. When Rex Bosarge first started working for the county he worked every day on petitioner's farm, the same hours as Lennis Hudson worked on petitioner's farm, and he rode to and from the farm with Lennis Hudson. Rex Bosarge also worked every day for approximately *269 three weeks with J. D. Ladner on petitioner's farm. J. D. Ladner operated a motor grader and a D-5 Caterpillar tractor owned by Harrison County on the farm. While Rex Bosarge worked on petitioner's farm he was supervised by another county employee by the name of Bobby Daniels. Rex Bosarge worked both on the Big Level farm and the Red Creek farm. Rex Bosarge helped build and maintain fences on the farm and he planted grass in pastures and with a disc prepared pastures for planting by using a D-3 Caterpillar bulldozer. Rex Bosarge also used a D-3 bulldozer on the roads on petitioner's farm and to build ditches on the side of the road. Rex Bosarge pulled stumps out of the land using the D-3 bulldozer. In addition Rex Bosarge did work on the farm feeding and branding cattle and planting corn and other crops. On one occasion Rex Bosarge and J. D. Ladner loaded a truck with some pipe belonging to Harrison County that was on the beach in Biloxi and took the pipe to petitioner's farm and unloaded it. L. C. Holsi, another county employee employed by Beat 5, was assigned to work on petitioner's farm by Joe Shelton. On two separate occasions Holsi was employed by Harrison County during *270 the time that petitioner was supervisor. L. C. Holsi's first employment with Harrison County was from 1974 to January 1977. Holsi spent at least 13 months out of the time of this employment working regularly on petitioner's farm. L. C. Holsi returned to employment with Harrison county in September 1977 and was immediately assigned to work on petitioner's farm. L. C. Holsi spent the next 20 months working from time to time on petitioner's farm until the FBI investigation began in February 1979. At times while L. C. Holsi was working on petitioner's farm he saw petitioner and received occasional instructions from him. L. C. Holsi was a heavy equipment operator and ran a D-4 and D-5 Caterpillar bulldozer *804 clearing land on petitioner's farm and working on roads. L. C. Holsi also helped build and repair fences and helped cut and bale hay on petitioner's farm. L. C. Holsi also worked on clearing the westmost 80 acres of the land known as the Crawford land. L. C. Holsi was not paid by petitioner for any of the work he did on his farm, but he did continue to receive his salary as an employee of Harrison County during all the time that he worked on petitioner's farm. L. C. Holsi was busy *271 during all of the time he worked on petitioner's farm. At one time L. C. Holsi complained to Joe Shelton that he was overworked and wished to stop working on the farm. Lennis Hudson was employed by Beat 5 of Harrison County at two different times while petitioner was supervisor of Beat 5. Hudson was employed by Harrison County during 1976 until January 1977 when he quit his employment. At that time Lennis Hudson had worked nine months on petitioner's farm on a daily basis. Lennis Hudson was reemployed by Harrison County in July or August of 1977. At that time Lennis Hudson worked approximately one month on county projects and then was sent back to petitioner's farm to work. Lennis Hudson stayed on the farm working on a regular basis for approximately one and one-half years, until February 1979. During the period from approximately May 1976 through January 1977, and the period from July 1977 through February 1979, Lennis Hudson helped to build a barn on petitioner's farm, helped L. C. Holsi build a fence, used a tractor to remove underbrush, used a disc, planted crop land, cut and baled hay, planted grass seed, patched fences, and fed cattle. During the period in 1976 to January *272 1977 when Lennis Hudson worked on petitioner's farm, he worked with L. C. Holsi for part of the time; and when he worked on petitioner's farm from July 1977 through February 1979, he worked most of the time with Rex Bosarge. Lennis Hudson sometimes saw petitioner on the farm, and on some occasions received directions from him. However, most of his directions came from another county employee, Bobby Daniels. During all of the time that Lennis Hudson worked on petitioner's farm, he was employed by Harrison County and paid by Harrison County for the work he did, except for one weekend when petitioner paid him $ 70 for some work he did over the weekend. Other than the $ 70, Lennis Hudson received no payment for any of his work from petitioner. During all of the days Lennis Hudson was working on petitioner's farm, he stayed busy with farm work for petitioner. Hudson complained at one time to Joe Shelton that the work was too hard and he wished to be transferred back to Harrison County work. Robert Marion Daniels (Bobby Daniels) was another Harrison County employee who was told to work on petitioner's farm in Stone County, Mississippi. Bobby Daniels originally went to work for Beat *273 5 of Harrison County in January 1977. Daniels was hired by petitioner to work for Harrison County as a heavy equipment operator. Although Bobby Daniels was hired as a Harrison County employee, he worked only three months out of the three years of his employment by Harrison County on Harrison County projects. The remainder of the three-year period Bobby Daniels worked on petitioner's farm doing farm work for petitioner. Daniels' only county work during the remainder of the period involved occasionally loading and hauling some gravel from a gravel pit near petitioner's farm. The work Bobby Daniels did on petitioner's farm included working with cattle, such as penning cattle, dehorning cattle, giving shots to cattle, spraying cattle, feeding cattle, cutting and baling hay, building and maintaining roads on the farm, building and repairing ponds, preparing fields for planting and planting fields in corn, wheat, and rye grass, cutting and clearing timber and logs, and working on drainage ditches and culverts. While Bobby Daniels was working on petitioner's farm he would begin work at approximately 7 a.m. in the morning and would quit somewhere between 3:00 p.m. and 6:00 p.m. Daniels *274 would work either five or six days and sometimes seven days a week, depending upon the work to be done. While Bobby Daniels worked on petitioner's farm he was paid by Harrison County and not by petitioner. Petitioner would bring Bobby Daniels his Harrison County payroll check and deliver it to him personally at the farm. Bobby Daniels was directed in his work on the farm by petitioner. Petitioner would tell him what work he wanted accomplished during a particular period of time and Bobby Daniels worked on this work and directed other county employees in their work. Bobby Daniels directed among other employees Lennis Hudson, J. D. Ladner, Bobby Ladner, and Rex Bosarge. Bobby Daniels was never hired as a night watchman for county equipment. County equipment that was on petitioner's farm was there for use for petitioner's benefit in the work on the farm. On one occasion Bobby Daniels went to the Harrison County barn and picked up some tile and culvert, and brought the tile and culvert to petitioner's farm, and installed the tile and culvert on petitioner's farm. Petitioner did not pay Bobby Daniels any cash compensation for work on his farm. Petitioner did permit Bobby Daniels and *275 his family to live rent free in a mobile home on the Saleta Breland property owned by petitioner. Petitioner furnished the utilities for the mobile home. Bobby Daniels was the son of Curtis Daniels, who was employed by petitioner as a manager *805 on the farm on the Ferris Batson land. At some time during the period that petitioner was supervisor of Beat 5 of Harrison County, a Harrison County employee named Bobby Ladner, while being paid by the county, worked on petitioner's farm as did a Harrison County employee named Arthur Adams and another named Walter Robinson. During the calendar year 1976, the total amount paid by Harrison County to its employees while those employees were working on petitioner's farm was $ 15,500. Of this amount 70 percent was with respect to work done which created capital improvements to the property, thus increasing its value, and the remainder was for general farm work. For the calendar year 1977, the total amount paid by Harrison County to its employees while those employees were working on petitioner's farm was $ 17,475, 70 percent of which related to items that constituted capital improvements to the lands or buildings and caused a corresponding *276 increase in their value. The remainder related to general farm work. During 1978 the total amount paid by Harrison County to its employees while those employees were working on petitioner's farm was $ 24,475. Of this amount, 70 percent related to work done by those employees creating capital improvements which increased the value of petitioner's property. The remainder was for general farm work. In 1979, the total amount paid by Harrison County to its employees while those employees were working on petitioner's farm was $ 10,550 and of this amount, 70 percent related to work done that constituted capital improvements to the farm, increasing its value, and the other 30 percent related to general farm work. During the years 1975, 1976, 1977, 1978, and through February 1979, various pieces of county equipment were used on petitioner's farm in connection with building capital improvements and doing farm work. This equipment was not in use at all times when it was on petitioner's farm, but was used on behalf of petitioner when needed in connection with farm work. The value of the county equipment used by petitioner on his farm for the time it was used in connection with his farm *277 work and improving petitioner's farm was $ 8,850 in each of the years 1975 and 1976, and was $ 11,000 in each of the years 1977, 1978, and 1979. The equipment was used primarily for work which constituted capital improvements to the farm, so that the amounts of the value of the equipment's use resulted in an increase in the value of petitioner's property. In 1975 a wooden bridge approximately 298 feet long and 12 feet wide was built across the lake on the Saleta Breland land. The bridge was built by H. E. Wilson Construction Company, which was not paid for its work in building the bridge although H. E. Wilson, Sr., received two bull calves and some hay from petitioner after the bridge was completed. The bridge was built in the fall of 1975 using wood that had been pressure treated with preservatives so that it would withstand the destructive effects of the water. H. E. Wilson Construction Company used a crew of three to four laborers and one equipment operator operating a dragline to build the bridge. The laborers and the equipment operator were all experienced personnel employed by the company for many years. The supervision of building the bridge was done by H. E. Wilson, *278 Sr. who, at the time he did this work, was partially retired from work with H. E. Wilson Construction Company. In 1975 the primary operation of the company was handled by H. E. Wilson, Jr., the son of H. E. Wilson, Sr. The materials used to build the bridge were provided by Treated Materials, Inc. at a cost to petitioner of $ 12,500. H. E. Wilson Construction Company had done business for many years with Beat 5 of Harrison County. It was the business relationship between Beat 5 of Harrison County of which petitioner was supervisor and the H. E. Wilson Construction Company that caused H. E. Wilson Construction Company to build the bridge for petitioner without compensation. The cost of the work done by H. E. Wilson Construction Company in building the bridge was approximately $ 13,250. Treated Materials, Inc. had done business with petitioner personally and with petitioner as supervisor of Beat 5 of Harrison County for many years. Petitioner was considered by Treated Materials, Inc. as a good customer. The total cost for labor and materials in building the bridge was $ 25,750. In 1977 petitioner built stables for his horses on the Breland land near the lake. The stables *279 were approximately 35 feet long and 16 feet wide. Along the front and rear was a framework of treated pilings driven into the ground at each corner and at approximately 4-foot intervals. There were nine such piling to form the front of the stables and nine to form the rear. Running through the middle of the stables lengthwise was another row of treated pilings to support the roof. Lumber 2 inches by 6 inches was used to form the perimeter of the stables and form the framework for the roof running from the front to the rear of the stables over the intermediate pilings in the middle. Stripping lumber, 1 inch by 4 inches, was placed lengthwise running from the side to each 2 by 6 rafter, continuing to the opposite end of the stables. Tin roofing material was nailed to the stripping and to the rafters. The sides of the stables were completed with 1-inch by 4-inch lumber nailed to the pilings to form walls on two sides and the rear of the stables. Gates were added to the front of the stables to form eight individual stalls. Dion Robinson, petitioner's son, and Mickey Stanley, *806 petitioner's brother-in-law, built the roof for the stables. They put on the rafters, stripping, and tin *280 roofing material. The cost of the stables was $ 3,800. The cost of a fence built on petitioner's farm in 1973 and 1974 was $ 6,300, one-half of such amount being spent in each year. During 1978 and 1979, John Braden was the owner of Braden Pump and Well Service Company, which had done work for Beat 5 of Harrison County, both in drilling and servicing wells. In the spring of 1978 petitioner called Mr. Braden and asked him to repair a well on his farm. Lightning had struck the well and the water supply from the well had been greatly decreased. Mr. Braden was able to get the well operating, but it only pumped four to five gallons of water per minute rather than the 50 to 60 gallons per minute that a well of that type should pump. Sometime around November 10, 1978, Mr. Braden was called to the Beat 5 barn to service the well at that barn. The well had lost its prime and would not pump water. He succeeded in getting the well to work on this service trip, but approximately one week later received another call that the well at the Beat 5 barn was not working again. When he went again to service the well, Mr. Braden tested it and determined that there was a hole in the casing of the *281 well, which meant that the well could not be repaired but a new well had to be drilled in order to get water for the Beat 5 barn. After Mr. Braden determined that the well could not be repaired, petitioner called him and asked Mr. Braden to meet him at the Beat 5 barn to discuss the drilling of a new well. Petitioner told Mr. Braden that he could have the contract to drill the well at the Beat 5 barn if he would also drill a new well at petitioner's farm in Stone County to replace the lightning-damaged well. Mr. Braden was told by petitioner to include in his bid for the county well enough money to drill the well at the farm and the bid would be approved. Mr. Braden submitted a bid for the Beat 5 well to be drilled to a depth of approximately 800 feet and the bid was approved. The bid was for a total of $ 5,144 with $ 2.50 to be added or subtracted for each foot that the well was drilled plus or minus 800 feet. The well at the Beat 5 barn was drilled only to 340 feet and, at this level, pure water was obtained. After the well at the Beat 5 barn was drilled, Mr. Braden drilled a well at petitioner's Stone County farm to a depth of between 450 and 500 feet. He submitted an invoice *282 for approximately $ 5,400 to Harrison County for drilling a well at the Beat 5 barn. Harrison County paid the invoice for the $ 5,400. Part of the invoice that Mr. Braden submitted to Harrison County was to cover the cost of drilling the well at petitioner's farm in Stone County. The value of Mr. Braden's services in drilling a new well on petitioner's farm in Stone County was approximately $ 2,400. Petitioner instructed Mr. Braden to take the old pump and tank from the Beat 5 barn and to repair them. Sometime later petitioner instructed Mr. Braden to take the repaired pump and tank and install them on his farm in Stone County. Mr. Braden, thereafter, installed the repaired pump and tank on petitioner's Big Level farm. The repaired pump and tank together were worth approximately $ 300 and the service work to install the pump was worth approximately $ 100. Prior to 1973 petitioner had only a small number of cattle and most of them were kept by petitioner on his father's farm. In 1973 petitioner began to greatly increase his cattle business and operate the business on his own farms. The expansion of petitioner's cattle business continued in 1974 with the acquisition of the Big *283 Level farm and continued to expand from that time through the end of 1979. During the years 1973 to 1979 petitioner had some Beefmaster cattle, some Brahma cattle, some Hereford cattle, and some range or woods cattle on his farm. Petitioner sold most of the registered purebred calves that were produced on his farm, although at times these calves were kept until they were 10 to 15 months old to determine their quality for breeding purposes. Petitioner continuously culled the older nonproductive cattle from his herd and replaced them with young heifer calves born to his herd. Of all of the registered purebred calves born on petitioner's farm during a year, he kept no more than 25 percent of the heifers to replace aging and nonproductive cows that were sold. Almost all purebred bull calves produced on petitioner's farm were sold. Any of petitioner's cattle that were not range or wood cattle, and were not registered purebreds, were referred to by petitioner as crossbred. Generally, petitioner did not keep any of the bull calves born to his crossbred herd each year, but would occasionally keep a bull calf that seemed promising as a herd bull. Petitioner only kept a few of the best *284 heifer crossbred calves born each year. Petitioner increased his cattle herd in size from 1973 to 1979 by both raised cattle and purchased cattle. Petitioner purchased cattle each year starting in 1973. During the later part of 1979 and the early part of 1980 petitioner and Sandra Robinson Gunter were in the process of obtaining a divorce. Mrs. Gunter engaged Walter E. Ross and Don W. King as her attorneys in the divorce proceeding. In preparing for the divorce proceeding, Mrs. Gunter, Mr. Ross, and Mr. King visited petitioner's farms in early 1980 for the purpose of estimating the numbers and types of cattle that petitioner owned and the value of those cattle. The count of cattle obtained by Mr. Ross and Mr. King with Mrs. Gunter's assistance on this visit to petitioner's farm showed *807 90 to 100 Beefmaster cattle, 60 Beefmaster-Brahma-Hereford crossbred cattle, and 400 range or woods cattle. Based on information as to the value of cattle furnished to them by Mrs. Gunter, Mr. Ross and Mr. King estimated the value of petitioner's cattle herd at December 31, 1979, to be $ 390,000, consisting of $ 250,000 for Beefmaster cattle, $ 60,000 for Beefmaster-Brahma-Hereford crossbred cattle, *285 and $ 80,000 for range or woods cattle. The general price range of Beefmaster cattle sold by petitioner in early 1980 was $ 1,500 to $ 3,000 although there were some few sales at less and some few sales at more. Based on the available evidence in this case, we find that the value of the cattle in petitioner's herd based on a cost price to petitioner was $ 190,000 for the Beefmaster cattle, $ 60,000 for Brahma-Hereford crossbred cattle and $ 80,000 for range or woods cattle at December 31, 1979, making a total of $ 330,000 as a cost price for all cattle in the herd, of which one-third were raised by petitioner, leaving a cost of all purchased cattle as of December 31, 1979, of $ 220,000. Since purchased cattle were acquired over the period 1973 through 1979, we hold that the cost of purchased cattle in petitioner's herd at December 31, 1973, 1974, 1975, 1976, 1977, and 1978 was $ 15,000, $ 43,800, $ 73,332, $ 109,998, $ 146,664, and $ 183,330, respectively. When Rose Breland visited petitioner at his farm on one occasion in 1979, he showed her a large quantity of cash which he told her he kept hidden at the farm. He told her he kept large quantities of cash at the farm. The cash *286 petitioner had on hand at the beginning of 1971 was 0 and the cash petitioner had on hand at the end of 1971, 1972, 1973, 1974, 1975, 1976, 1977, 1978, and 1979, was $ 300, $ 300, $ 300, $ 2,500, $ 5,000, $ 7,500, $ 10,600, $ 10,600, and $ 10,600, respectively. On October 5, 1981, respondent issued a summons under section 7602 to Walter E. Ross, Jr., a third-party recordkeeper within the meaning of section 7609(a)(3). On October 11, 1981, petitioner stayed compliance with the summons pursuant to section 7609(b) by giving notice to Mr. Ross not to comply. On January 15, 1982, a petition to enforce the summons was filed in the United States District Court for the Southern District of Mississippi. On February 22, 1982, the court ordered the documents turned over to respondent's agents and then obtained the documents on February 23, 1982. The summons enforcement proceeding was pending for 39 days from January 15, 1982, to February 23, 1982. Therefore, any period of limitations under section 6501 is suspended for 39 days. The period for making an assessment under section 6501(a) for 1978 was extended to May 24, 1982. Prior to 1968 petitioner's assets consisted mostly of his house *287 in Biloxi, his automobile dealership, and some few financial investments. After petitioner was elected the supervisor of Beat 5 of Harrison County, he began to acquire land and other assets. Petitioner Sandra Robinson Gunter was aware of the land that petitioner had acquired and knew about petitioner's purchase of cattle. In her divorce proceeding, Mrs. Gunter obtained the house in Biloxi, the real estate on Dedeaux Road, and $ 10,000 cash. The Dedeaux Road real estate was ceased for $ 1,000 per month at the time Mrs. Gunter received it. Petitioners' Federal income tax returns for each of the years here in issue were prepared by an accountant from information furnished by petitioner. After the returns were prepared, petitioner would bring the returns to Mrs. Gunter who would glance over them and sign them. On their tax returns for the years here in issue, petitioners reported the following amounts and sources of income: Items Included in Adjusted Gross Income
Adjusted Gross
Wages and
Other
Year
Income
Salary
Dividends
Interest
Income *
1971
$ 28,679.27
$ 17,282.16
$ 9,812.50
$   151.56
$  1,433.05
1972
55,672.80
13,353.95
1,379.99
40,938.86
1973
29,121.21
12,399.96
4,293.39
12,427.86
1974
11,236.13
13,458.22
733.15
(2,955.24)
1975
22,280.27
15,000.00
66.11
7,214.16
1976
35,495.09
15,000.00
395.57
20,099.52
1977
34,072.25
15,500.00
174.57
18,397.68
1978
50,736.00
17,400.00
148.00
33,188.00
1979
60,432.00
17,400.00
5,030.00
38,002.00
*288 The first year that petitioner reported gain or loss from operation of the farm was 1973. Thereafter, for each of the years 1974 through 1979, petitioner reported farm gain or loss. For 1973 petitioner reported sales of purchased livestock (cattle) of $ 3,888.48 with a reported gain on the sales of $ 381.08. Petitioner reported sales of market livestock and produce raised and held primarily for sale and other farm income of $ 2,856.63. Under expenses, petitioner deducted *808 labor hired of $ 2,100 and various other expenses including repairs and maintenance, interest, feed purchased, and similar items, making a total of expenses of $ 10,732.68. Petitioner reported depreciation of $ 3,267.62, making total deductions of $ 14,000.30. For 1974 petitioner reported sales of purchased livestock *289 of $ 40,330.61 which he stated had a cost basis of $ 36,604.27 with a profit from the sales of $ 3,726.34. Petitioner reported sales of market livestock and produce raised of $ 6,753.02 for cattle, vegetables of $ 1,447.50, and hay of $ 27.00. Petitioner also reported rent of $ 250.00 under other farm income. Petitioner reported total expenses of $ 19,839.58 consisting of hired labor of $ 3,612.50 and various other items including repairs, feed purchased, fertilizer, and machine hire. Petitioner reported depreciation of $ 5,177.41, making total deductions of $ 25,016.99. For 1975 petitioner reported sales of purchased livestock of $ 2,900 with a cost of $ 1,850, resulting in a profit of $ 1,050. Under sales of market livestock and produce raised, petitioner reported cattle sales of $ 16,334.44, pecan sales of $ 1,807, and hay sales of $ 200, and under other farm income he reported machine work of $ 647.50, agriculture program payments, cash, of $ 346.50, making a total for market livestock and produce raised and other farm income of $ 19,335.44. Under expenses petitioner reported labor hire of $ 2,600 and various other items including repairs, feed purchased, and fertilizer *290 purchased, resulting in total expenses of $ 18,622.22. Petitioner reported depreciation of $ 5,323.51, resulting in total deductions of $ 23,945.73. For 1976 petitioner reported sales of purchased livestock of $ 23,266.06 with a cost of $ 26,929.09, resulting in a loss from sale of purchased livestock of $ 3,663.03. Under sales of market livestock and produce raised petitioner reported cattle sales of $ 23,847.48, grain sales of $ 9,960.40, and seed sales of $ 5,039.40. Under other farm income petitioner reported miscellaneous income of $ 200, thus arriving at a gross profit of $ 35,384.25. Under expenses petitioner reported hired labor of $ 183.90 and various other items such as repairs, feed purchased, and fertilizer purchased, totaling $ 24,549.38. Petitioner claimed a depreciation deduction of $ 4,758.25, making total deductions of $ 29,307.63. For 1977 petitioner reported no sales of purchased livestock. Petitioner reported sales of market livestock and produce raised of cattle of $ 31,581.18, hay of $ 312.50, and seed of $ 2,760, resulting in total gross profits reported of $ 34,653.68. Under expenses petitioner took no deduction for hired labor, but claimed deductions *291 for repairs, feed purchased, fertilizer purchased, and similar items, totaling $ 21,005.83. Petitioner claimed depreciation of $ 3,377.15, resulting in total deductions claimed of $ 24,382.98. For 1978 petitioner reported total sales of purchased livestock and other items purchased for resale of $ 1,930 with a cost of $ 1,248 and a profit of $ 682. Petitioner reported sales of raised livestock and produce and other farm income of cattle sales of $ 36,299, hay of $ 165, and miscellaneous income of $ 484. Under expenses petitioner claimed no deduction for labor hired, but did deduct items such as repairs, feed purchased, fertilizer purchased, and seed purchased, resulting in total expense deductions of $ 20,832. Petitioner claimed depreciation of $ 2,963, resulting in total deductions claimed of $ 23,795. On the schedule of farm income and expenses for 1979 petitioner reported sales of livestock and other items bought for resale of livestock only totaling $ 18,101 with a cost of $ 10,801, showing a profit of $ 7,300. Under sales of livestock and produce raised and other farm income petitioner reported cattle sales of $ 60,160, hay sales of $ 764, and crop damage payment of $ 600. *292 Under expenses petitioner reported cost of hired labor of $ 1,869 and reported other expense items such as repairs, and maintenance, interest, feed purchases, seeds, and fertilizer totaling $ 55,182. Petitioner claimed depreciation in 1979 of $ 1,906, making total farm deductions claimed of $ 57,088. Respondent in his notice of deficiency computed petitioners' income for each of the years here in issue on the increase in net worth plus expenditures basis and on this basis determined additional income of $ 90,189.73 for the year 1971, $ 54,653.20 for 1972, $ 105,392.56 for 1973, $ 153,746.64 for 1974, $ 172,551.99 for 1975, $ 99,577.73 for 1976, $ 91,418.61 for 1977, $ 114,586.54 for 1978, and $ 56,841.88 for 1979. Respondent in his notice of deficiency also determined that petitioner was liable for the addition to tax for fraud under section 6653(b) for each of the years here in issue. At the trial respondent made certain concessions with respect to the income as computed in the notice of deficiency, still computing petitioner's income on the net worth plus cash expenditures basis. At the trial and on brief respondent made various concessions with respect to the underreporting *293 of income by petitioner. In his brief respondent contends that petitioner underreported his income for the year 1971 by $ 39,350. Respondent claims no underreporting for the year 1972, but concedes no deficiency in that year. For 1973 respondent now claims underreporting of $ 61,544, for 1974 underreporting of $ 133,426, for 1975 an underreporting of $ 124,742, for 1976 an underreporting of $ 97,531, for 1977 an underreporting of $ 109,483, for 1978 an underreporting of $ 139,362, and for 1979 an underreporting of $ 68,655. Petitioner in his brief concedes net worth items and expenditures which result in income underreported by petitioner for 1971 of $ 22,512, an overreporting in 1972 of $ 11,299, *809 underreporting in 1973 of $ 2,844, an overreporting in 1974 of $ 19,867, underreporting in 1975 of $ 10,743, an overreporting in 1976 of $ 11,301, an overreporting in 1977 of $ 7,719, an underreporting in 1978 of $ 30,220, and an overreporting in 1979 of $ 38,719. Petitioner takes the position that respondent has not established fraud in any of the years here in issue and that the only year not barred by the period of limitations at the time the notice of deficiency was issued was 1979. *294 He apparently does not contest respondent's contention that 1978 was open when the notice of deficiency was mailed because of petitioner's staying of compliance with the summons issued by respondent to a third-party recordkeeper pursuant to section 7609(b). OPINION Our findings show that based on a net worth plus cash expenditures basis using the cost of assets either agreed upon by the parties or as set forth in our findings, petitioners underreported their income in each year here involved except 1972 and possibly 1979. Therefore, since all of the years involved in this case, other than the years 1978 and 1979, are barred by the period of limitations absent respondent establishing fraud, we will first discuss the issue of fraud. We will discuss the year 1979 with respect to petitioner's activities that might be indicative of fraud. However, if there is no deficiency for 1979 based on the facts we have found, petitioner is, of course, not liable for any addition to tax for fraud for 1979. Until a recomputation of petitioners' income tax is made in this case under Rule 155 we are not sure whether there is a deficiency in petitioners' income tax for 1979. Respondent did not *295 determine the additions to tax for fraud against Sandra Robinson Gunter, but in fact concedes that she is not liable for the addition to tax for fraud in any of the years here involved. Therefore, in discussing the additions to tax for fraud, the issue is with respect to petitioner Arlan Robinson only. Whether a taxpayer is subject to the addition to tax for fraud is a question of fact to be determined from a consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Fraud is never presumed and is required to be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). By statute, the burden is on respondent to prove fraud and to carry this burden respondent must establish by clear and convincing evidence that petitioner intended to evade taxes known to be owing. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Also, when fraud is determined for a number of years, as in this case, respondent must establish by clear and convincing evidence that some part of an underpayment *296 of tax is due to fraud for each of the taxable years for which an addition is determined. Castillo v. Commissioner, 84 T.C. 405, 409 (1985). Various factors have been considered to be indicative of fraud, but it has been held that respondent may prove fraud through circumstantial evidence since direct evidence of a taxpayer's intent is not often available. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner, supra at 1123.The parties are not in disagreement as to the principles governing establishment of the intent to evade tax necessary to support the addition to tax for fraud or that the burden of establishing fraud is on respondent. Their arguments focus on the evidence. Respondent contends that the evidence is clear and convincing of taxpayer's intent to evade a tax known to be owing in each of the years here in issue, except the year 1972, which respondent has conceded. Petitioner contends that there is no such clear and convincing evidence of fraud in any of the years here in issue. We will begin with the taxable year 1971. From the computation *297 of income on the net worth plus expenditures basis, which neither party argues is inappropriate in this case, there is an underpayment of tax in 1971, although the parties disagree as to the amount of such underpayment. Their disagreement centers on whether a dam and lake were constructed on petitioner's Stone County property in 1970 or 1971, and, regardless of the year in which constructed, the cost of the dam and lake. Respondent contends that the evidence shows that the dam was constructed in 1971 at a cost of $ 18,050. Petitioner contends that the dam was constructed in 1970 at a cost of $ 6,310 and that since it was part of petitioner's net worth in 1970, the cost of the dam is not an item that increases petitioner's net worth in 1971. The only item that respondent contends supports a fraud addition in 1971 is the construction of the dam. The other items comprising petitioner's net worth in 1971 are all agreed items. Respondent does contend that a consistent understatement of tax by petitioner throughout a series of years supports his claimed addition to tax for fraud in 1971. However, 1971 is the first year here involved and respondent has conceded that there is no deficiency *298 or addition to tax for fraud in 1972. There is no showing of a consistent understatement for years prior to 1971 or for the following year. The evidence is not completely clear as to whether the dam was built in 1970 or 1971. If respondent was only required to show by a preponderance of evidence the time when the dam was built, or the burden was on petitioner to *810 show when the dam was built, we might conclude that it was built in 1971. However, there is no clear and convincing evidence of the date of the building of the dam or its cost. Furthermore, it is not clear whether petitioner paid the full cost of construction of the dam. If petitioner paid the cost of construction of the dam, this item would nevertheless increase his net worth in 1971, if first built in that year, but would not be indicative of fraud. Based on the evidence as a whole, we conclude that respondent has failed to establish fraud for the year 1971 and as previously stated, respondent has conceded the issue for 1972. Therefore, the statute of limitations bars the assessment and collection of any deficiency in petitioner's income tax for the years 1971 and 1972. This, of course, does not mean that these years *299 may not be considered in determining the increases in petitioner's net worth for subsequent years, and the items that are included in the net worth statement for these years need to be determined in connection with the deficiencies in subsequent years. The evidence respondent has produced with respect to the years 1973 through 1979 is strongly indicative of fraud. The evidence shows that beginning in about the middle of 1973, Breland Trucking and Construction Company did work on petitioner's farm without compensation in order to obtain business through petitioner from Beat 5 of Harrison County. Starting in early 1974, cash payments were made on behalf of Breland Trucking and Construction Company to petitioner in order for Breland Trucking and Construction Company to obtain work on county projects in Beat 5 of Harrison County. The record is clear that petitioners did not include in their income, as reported, the value of the work done for petitioner on his farm in Stone County by Breland Trucking and Construction Company and that Breland Trucking and Construction Company was not paid by petitioner for that work. The record is equally clear that petitioner did not include in income *300 the cash payments made on behalf of Breland Trucking and Construction Company to him in order to obtain work for Beat 5 of Harrison County. In fact, petitioner denies receiving any cash payments and denies that any appreciable work was done by employees of Breland Trucking and Construction Company on his farm in 1973 and 1974. Petitioner argues that there is no support in the record for the payments to him and the work done on his farm by employees of Breland Trucking and Construction Company except Rose Breland's testimony, and that she should not be believed but he should be believed in denying receiving these items. We do not believe petitioner's testimony that work was not done by employees of Breland Trucking and Construction Company on his farm or that cash payments were not made on behalf of that company to him. Contrary to petitioner's contention, there is support for Rose Breland's testimony. Wallace Love, an employee of Breland Trucking and Construction Company, testified as to working on petitioner's Stone County farm when he was an employee of Breland Trucking and Construction Company. There is support for Rose Breland's testimony of cash payments in the testimony *301 of Joe Shelton with respect to his instructions to approve tickets for shortages when certain payments were made to Don Breland, Rose Breland's husband, for materials furnished to Beat 5 of Harrison County. There is also testimony by Joe Shelton and another supplier to Harrison County that cash kickbacks were made to petitioner. There is also testimony that it was customary for suppliers of services and products to Beat 5 of Harrison County during the period of time that petitioner was supervisor to make kickbacks to petitioner. We believe the testimony of Rose Breland that Breland Trucking and Construction Company employees did work on petitioner's farm, that equipment of the company was used for work on his farm, and that asphalt and other materials were furnished in connection with the work on petitioner's farm without any compensation to Breland Trucking and Construction Company from petitioner. The only evidence of any compensation for this work is a payment approved by petitioner of $ 12,000 to Breland Trucking and Construction Company from Harrison County for work that had not been done for Harrison County. Petitioner, himself, admitted that some asphalt was placed on *302 his farm by Breland Trucking and Construction Company, but testified that it was low quality asphalt that was given to him by Don Breland, Rose Breland's husband. He also claims that Don Breland gave him some equipment that was old and not worth much. Don Breland was not called as a witness to confirm this testimony. We do not believe petitioner's testimony in regard to these gifts from Don Breland. If the testimony were true, Don Breland could have been called as a witness to verify the statements. The record in this case also shows that starting in 1976 county employees who were paid by the county worked off and on on a fairly consistent basis on petitioner's farm with no compensation from petitioner. Their entire compensation was received from Harrison County. Petitioner also denies that these employees worked on his farm while they were being paid by Harrison County. However, the record is replete with testimony from these employees that they did work on his farm without any compensation from petitioner while they were employed by and receiving pay from Harrison County. The value of these services was not included in petitioner's reported income. Likewise, there is evidence *303 of use of *811 county equipment on petitioner's farm without compensation to the county beginning in 1975, as well as use of equipment of Breland Construction Company on his farm without compensation during 1973 and 1974. There is testimony that petitioner required Breland Construction Company to leave certain equipment with him without compensation. The work of the county employees and the county equipment extended throughout the years 1976, 1977, 1978, and 1979. There is also evidence that in 1975 a bridge was built on petitioner's farm by a contractor that did business with Harrison County without payment by petitioner. Petitioner claims this was a gift, but the evidence does not support petitioner's claim of a gift. The work was done for petitioner because he was in a position as supervisor of Beat 5 of Harrison County to give business to the company that built the bridge. It is clear that the cost of the bridge was not reported in petitioner's income. In our view the receipt of services, supplies, and cash from suppliers of services and equipment to Harrison County during the years 1973, 1974, 1975, 1977, and 1978, and the value of work done by employees of Harrison County who *304 were being paid by Harrison County in 1976, 1977, 1978, and 1979, none of which was included by petitioner in his reported income, is clear and convincing evidence of fraud. The evidence also shows that gas tanks and pumps were furnished to petitioner by a well-driller who did work for Harrison County in 1978, and that a well was drilled by this contractor who did business with Harrison County for petitioner in 1978 and the compensation for the well was paid by Harrison County. This amount was not included by petitioner in his income. Petitioner also denies the well being drilled on his farm with payment being made by Harrison County. However, petitioner was convicted of diverting funds of the Federal government furnished to Harrison County with which to pay for work such as building the well by having the county pay for a well built on his property in 1978 and was also convicted of having work done by employees of Harrison County on his farm while they were being paid by Harrison County with funds furnished in part by the Federal government in the years 1977, 1978, and 1979. In spite of this conviction, petitioner denies that the well was paid for with Harrison County funds *305 or that the employees of Harrison County while being paid by Harrison County worked on his farm in 1976, 1977, 1978, and 1979. We do not believe petitioner's testimony denying these facts. Clearly, the value of neither the well nor the work of the county employees was included in petitioner's reported income. In our view petitioner's failure to include these items in income and denying receipt of the items is clear and convincing evidence of fraud on the part of petitioner with intent to evade tax. See Blanton v. Commissioner, 94 T.C. (March 22, 1990), in which we held the taxpayer collaterally estopped to deny receipt of funds he had been convicted of receiving. Respondent does not argue collateral estoppel in this case, but does argue that petitioner's conviction is evidence of his receipt of labor and property paid for by Harrison County. By the net worth method respondent has shown that petitioner had unreported income in each of the years 1973 through 1978 and possibly for 1979. Since petitioner did not report the income he received from kickbacks and work done for him by county employees while being paid by the county, the conclusion is clear that some of the underreporting *306 of income was due to this failure. Petitioner's failure to report income from kickbacks in cash, labor, and materials was due to fraud with intent to evade tax. There is other clear and convincing evidence of fraud in this case. Petitioner did not keep books and records from which his tax could be properly computed. He dealt in cash and he was uncooperative with the revenue agent investigating his tax liability, so that the agent was forced to compute the liability from third-party sources. In our view, the evidence in this record clearly shows that during the years 1973, 1974, 1975, 1976, 1977, 1978, and 1979 petitioner omitted from his returns as filed, income which he knew he should have reported with an intent to evade tax. Since we have concluded that petitioner's tax returns for each of the years 1973 through 1978 were false and fraudulent, the assessment and collection of tax due from petitioner in those years is not barred by the statute of limitations. We now turn to the computation of the amount of petitioner's unreported income for the years 1973 through 1979. Respondent in the notice of deficiency computed petitioners' income on a net worth plus cash expenditures *307 basis. Respondent proceeded at the trial on this basis. On brief respondent makes some argument that might be interpreted, though it is not clear, that petitioners' underreporting of income might also be computed on an omitted items basis. If this is intended by respondent as an alternative argument raised for the first time on brief, we will not consider it. It is well settled that issues not raised by the pleadings or at trial, but argued for the first time on brief, should not be considered. Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975); Greenberg v. Commissioner, 25 T.C. 534, 537 (1955). We will, therefore, only consider the amount of petitioners' underreporting of income computed on a net worth basis as respondent determined in the deficiency notice and contended at trial. *812 A net worth computation begins with an opening net worth which consists of the total net asset value of the taxpayer's assets at the beginning of a given year. It then shows *308 the increases or decreases in the taxpayer's net worth for each succeeding year during the period involved and calculates the difference between the cost of the taxpayer's assets at the beginning and end of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases and if the resulting figure for any year is substantially greater than the taxable income reported for that year, the excess is stated to represent unreported taxable income. Holland v. United States, 348 U.S. 121 (1954). The theory of the net worth method as a tax measuring device deals with cost or tax basis of assets rather than with changing values. As we stated in Bedeian v. Commissioner, 54 T.C. 295, 299 (1970): The term "net worth" in this context does not mean the economic affluence of the taxpayer, but instead means the difference, as of the end of the taxable year, between the value of his assets in terms of actual expenditures therefor and his liabilities. The reference is to the tax basis of an asset, not to its *309 fluctuating market value. * * * Thus, items such as depreciation -- which affect value but entail no current outlay -- are taken into account only if they are deductible; otherwise the "net worth increase" for each year, which is one of the components of adjusted gross income as computed by the method, would be reduced by an amount which could not be deducted in computing taxable income. In a footnote we pointed out that were the decline in value of a nondepreciable asset reflected in the computation of the assets, the same amount would have to be added to the net worth increase as a nondeductible expenditure. The result would be the same as disregarding such diminution in the value in initially computing the value of assets. We further pointed out in Bedeian v. Commissioner, supra, that while values of assets may change from an economic standpoint, the net worth computed for the purpose of determining taxable income is not affected by such changes in values. In other words, the presumption from a net worth statement is that the assets acquired at their cost were acquired with taxable income, unless some source of nontaxable income for the acquisition *310 can be shown, and that if a taxpayer has not reported taxable income sufficient to acquire these assets and cannot show a source of nontaxable income for their acquisition, the cost of the assets must constitute income to the taxpayer. In the instant case, the evidence shows that petitioner acquired numerous assets such as a bridge, a well, roads, land improvements, and the like, as income in kind. Therefore, here it is necessary to determine what the cost of these assets would be to petitioner by use of the value of the materials and services furnished for which petitioner did not pay. This does not affect the nature of a net worth computation, but merely increases the difficulty of making such a computation. In our view, petitioner is correct in his contention that where work done for him did not increase the value of his assets or create a new asset it does not affect his net worth even though on another basis of reconstructing income it would be considered income. As petitioner points out, such uncompensated-for labor did not add to the value of his assets and, therefore, is not to be considered in determination of petitioner's unreported income by the net worth method. *311 In this case there is little disagreement between the parties as to petitioners' beginning net worth. The only difference in the computation of net worth as of January 1, 1971, between the parties is that petitioner includes $ 6,310 as the value of the dam and lake which he contends was constructed in 1970 and respondent includes no item as of January 1, 1971, for the dam and lake. Since we have determined that respondent has failed to establish fraud for the year 1971 and, therefore, the year is closed, it makes no difference in a net worth statement whether the value of the dam and lake is included at the beginning of 1971 or as being acquired during 1971. We have held for respondent as to the value of the dam and lake of $ 18,000. However, since this item will be included in the net worth computation for every year for which a tax liability will be determined, the amount thereof is immaterial. Therefore, it is reasonable to say no issue exists as to petitioner's beginning net worth as of January 1, 1971, other than the issue as to cash on hand. Once the value of the dam and lake is disposed of, there is no difference in the net worth computations of petitioner and respondent *312 as of the end of 1971, except petitioner shows cash on hand for the beginning and end of 1971 as $ 1,360, whereas respondent shows it as zero at the beginning of 1971 and $ 300 at the end of 1971. There is also a slight difference at the end of 1971 in the amount shown for furniture, fixtures, and jewelry. Petitioner shows $ 6,510 for this figure and respondent shows $ 5,000. For the end of the year 1972, the only difference in the computations of the parties is that petitioner shows furniture and fixtures at the end of this year as $ 7,914 which amount petitioner uses throughout the balance of the net worth computation, and respondent shows $ 10,000 and increases in the subsequent years. There is, of course, the same difference in the value of the dam and lake, but as previously stated, considering *813 the way a net worth statement is made, this is an immaterial difference. Another difference is that petitioner shows some purchased cattle on hand at the end of 1972 and respondent shows none, his first purchased cattle appearing in his net worth statement in 1973. We have resolved these differences in favor of respondent as set forth in our findings of fact. The testimony in this *313 case supports the conclusion that in the first few years here in issue petitioner kept very little cash on hand and therefore respondent's showing of $ 300 at the end of each of the years 1971, 1972, and 1973 is more reasonable than petitioner's showing of $ 1,360. Beginning in 1974 respondent shows progressive increases in cash on hand and in our view the record supports respondent's computation in this regard. There is a showing in the record of cash payments to petitioner beginning in 1974. There is direct evidence of petitioner having cash on hand in excess of the amount petitioner includes in his computations. Rose Breland testified with respect to petitioner's statement to her about the cash he had available and about cash she saw at his farm. Considering the cash that petitioner was given as kickbacks in connection with work done for Harrison County, we conclude that respondent's computation is more reasonable than petitioner's and the computation of cash on hand which respondent argues on brief is supported by the evidence. We, therefore, conclude that petitioner's cash on hand at the end of 1971, 1972, and 1973 was $ 300 each year, at the end of 1974 was $ 2,500, at the *314 end of 1975 was $ 5,000, at the end of 1976 was $ 7,500, at the end of 1977 was $ 10,600, and this same amount was on hand at the end of 1978 and 1979. We likewise sustain respondent's determination of increases in value of furniture, fixtures, and jewelry. During the years 1972 through 1979 petitioner was furnishing a house in Stone County. The only evidence petitioner produced of items purchased was some carpeting purchased in 1972. However, the record shows that petitioner's house was well furnished and was well fitted out with appliances. The evidence of the amount and type of furnishings in petitioner's house supports the amounts for which respondent contends. We have effectively dealt with the other items that make up the net worth statement in our findings of fact and based on those facts we hold as follows with respect to the items on which the parties disagree. The first of these items is land development by Breland. We have found the total amount of work done by Breland Trucking and Construction Company based on the amount it would have cost petitioner had he paid for the work. This amount was testified to by Rose Breland. However, we have also found that a portion *315 of this work was not work that increased the value of petitioner's assets. Since this is a net worth computation based on asset cost only, the portion of this work that went to developing new assets for petitioner should be included in the net worth statement. We, therefore, have concluded that the land development done by Breland Trucking and Construction Company for which petitioner did not pay was $ 50,000 at the end of 1973 and $ 100,000 at the end of 1974 and each succeeding year. The next item of disagreement is the bridge built in 1975. We have found in our facts that the cost to petitioner had he paid for building of the bridge rather than have it given to him in return for approving work for a contractor for Harrison County would have been $ 25,750 and this amount is includable in the net worth computation at the end of 1975 and in every year thereafter. The bridge was a form of "kickback" to petitioner, not a gift. The next item is land development by county employees upon which the parties disagree. We have found that county employees did work for petitioner while they were paid by the county beginning in 1976 and continuing through 1979. We do not believe petitioner's *316 testimony to the contrary. However, none of the work done by them that did not add to the value of petitioner's assets and was not capital in nature increased petitioner's net worth. Using our best judgment from the testimony, we have concluded that the additional asset value created by work of county employees on an accumulative basis was at the end of each of the years 1976 through 1979, $ 75,500, $ 32,975, $ 57,450, and $ 68,000, respectively. Of these amounts 70 percent was the cost of capital assets which increased petitioners' net worth. The next item on which there is disagreement is land development by county equipment and in our findings we have also disposed of this issue by holding that the capital improvement addition to asset value was at the end of each year as follows: 1975-$ 8,853, 1976-$ 17,700, 1977-$ 28,700, 1978-$ 39,700, and 1979-$ 50,700. The next item of disagreement is with respect to stables. Petitioner includes only $ 100 for this item and respondent includes $ 3,800 at the end of 1977 and the end of each year thereafter. As we have set forth in our findings, we agree with respondent that the stables had a cost basis to petitioner of $ 3,800 which is *317 includable in the net worth computation at the end of each of the years 1977 through 1979. The final item on which there is disagreement is the cost of purchased cattle and we have set forth our determination in that regard in detail in our findings which is that the cost of purchased cattle was zero at the end of 1971 and 1972 and was $ 15,000, $ 43,800, $ 73,332, $ 109,998, $ 146,664, $ 183,330, and $ 220,000 at the end of 1973, 1974, 1975, 1976, 1977, 1978, *814 and 1979, respectively. Petitioner argues that a computation prepared by his accountant from information furnished by petitioner shows to the contrary of our findings. We do not believe petitioner's testimony that the records he furnished to his accountant to prepare this schedule were an accurate record of purchases and sales of cattle. Therefore, the schedule is worthless. Although the computations by the parties in their briefs show some difference in reserve for depreciation, neither party argues this point and presumably the parties will be able to dispose of this item in a Rule 155 computation. A recomputation of petitioner's tax liability on the net worth basis using the agreed-upon items and the items which are *318 in controversy as we have found them will produce the amount of petitioner's underreporting of income in each of the years 1973 through 1979. The final issue in this case is whether Sandra Robinson Gunter who signed a joint return with her husband should be relieved of liability for any deficiency in tax including interest, penalty, and other amounts under the provision of section 6013(e) referred to as the "innocent spouse" provision. Respondent did not determine the addition to tax for fraud against Mrs. Gunter, but does contend that she is jointly and severally liable for the deficiencies. Section 6013(e)(1) provides that: (a) where a joint return was filed, (b) on that return there is a substantial understatement of tax (an amount in excess of $ 500) which is attributable to grossly erroneous items of one spouse, (c) the other spouse establishes that in signing the return he or she did not know and had no reason to know that there was such substantial understatement, and (d) taking into account all the facts and circumstances, it is inequitable to hold the spouse liable for the deficiency *319 in tax for such taxable year attributable to such substantial understatements, the spouse to whom the substantial understatement was not attributable is relieved from liability for the tax on such substantial understatement. Here it is clear and has been stipulated that joint returns were filed. We have held that there is an understatement of tax for each of the years 1973 through 1978 and possibly for 1979 which meets the definition of substantial understatement. This leaves, therefore, in conflict between the parties, whether Mrs. Gunter in signing the return did not know and had no reason to know that there was a substantial understatement and whether it would be inequitable to hold her liable for the tax. The record here shows that while she was married to petitioner Mrs. Gunter did not actively participate in his business activities. Rather she primarily looked after keeping the home and caring for their three children. She received all of her support from petitioner. The record also shows that the joint income tax return for each of the years here involved was prepared by a certified public accountant from information furnished to the accountant by petitioner. However, *320 the record shows that in connection with her obtaining a divorce from petitioner, Mrs. Gunter was aware of the assets petitioner had and, in fact, even had her attorneys go out and count the cattle on the farms. The record shows that through the years as petitioner was acquiring various pieces of property, Mrs. Gunter, his then wife, was aware of the acquisitions. There is nothing in the record to show that Mrs. Gunter knew of the work done on the land by employees of contractors as a form of kickback to petitioner or of the cash kickbacks petitioner received or the work done by county employees prior to 1979. In fact Mrs. Gunter testified she was unaware of this until the FBI investigation started and we believe this testimony. On the other hand, Mrs. Gunter was aware not only of the land acquisitions but of the various improvements and it might be questioned whether she should have questioned if these improvements were possible with the amount of income being reported on their tax returns. Also, after the FBI investigation of petitioner started in early 1979, Mrs. Gunter should have become aware of the receipt by petitioner of unreported income. Prior to 1979 there is nothing *321 in the record to indicate that she knew of this unreported income. This is not a case of no income or minimal amounts of income being reported. Mrs. Gunter testified that as far as she was aware she and the family were living on the income as reported. Mrs. Gunter's testimony impressed us as truthful. Until 1979 there was no specific fact to alert Mrs. Gunter to possible unreported income of petitioner. Mrs. Gunter, when she was petitioner's wife, received adequate support from petitioner. Mrs. Gunter's testimony was that she received no expensive gifts from petitioner during the years here in issue and we have no reason to doubt this testimony. The only advantage Mrs. Gunter appears to have obtained from the unreported income, unless her divorce receipts are considered to have come from the unreported income, was a few weeks each summer and some weekends at the farm. In the divorce Mrs. Gunter received the Biloxi house which was purchased prior to the years here in issue, $ 10,000, and a piece of real estate rented at $ 1,000 a month. This settlement appears to represent nothing more than normal support. Considering the record as a whole, we conclude that Mrs. Gunter is *322 entitled to the relief provided for under section 6013(e) for each of the years here in issue except for the year 1979 (if there is a deficiency in that year) when, because of the FBI investigation *815 that had begun at that time, she should have known of petitioner's receipt of labor paid for by Harrison County and ascertained whether the amount was included in reported income. Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954 as applicable to the years here in issue.↩
*. Figures not in parenthesis are additions which increase net worth and figures in parenthesis are reductions which decrease net worth.↩
*. This item includes capital gains of $ 39,488.86 for 1972, $ 19,966.50 for 1973, $ 1,799.89 for 1974, $ 650.00 for 1975, $ 101.98 for 1977, $ 6,180.00 for 1978, $ 12,008.00 for 1979, and a capital loss of $ 335.00 for 1976.↩